USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/11/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

REGINALD THAWNEY,

                              Plaintiff,

-v-

THE CITY OF NEW YORK; DEPARTMENT OF
CORRECTION COMMISSIONER JOSEPH PONTE;
CAPTAIN NACIREMA SUMMERS SHIELD NO. 1108;
CORRECTION OFFICER BIANERY GARCIA SHIELD
NO. 4878; JOHN DOE CORRECTION OFFICIAL IN
CHARGE OF PRISONER MOVEMENT AT MDC; JOHN
AND JANE DOE CORRECTION OFFICERS ## 1–9,

                              Defendants.

17 Civ. 1881 (PAE)

OPINION & ORDER

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Reginald Thawney brings this action under 42 U.S.C. §§ 1983 and 1988 and New York state law against the City of New York ("City"), the Department of Correction ("DOC") Commissioner Joseph Ponte, Captain Nacirema Summers and Correction Officer Bianery Garcia, and several John Doe correction officials (collectively, "defendants"). Thawney, an inmate formerly housed at the Manhattan Detention Complex ("MDC"), alleges that on April 12, 2016, several other inmates assaulted him as he was being transferred to a new housing unit. He alleges that defendants were deliberately indifferent to his risk of serious harm at the hands of other inmates, and he claims that defendants' conduct deprived him of his rights under the Eighth and Fourteenth Amendments. Pending now is defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court dismisses Thawney's claim of municipal liability against the City and Commissioner Ponte, and denies the motion to dismiss as to all other claims.

## I. Background[1]

### A. Factual Background

At some point before April 12, 2016, Thawney was processed into a correctional facility on Rikers Island. As part of this intake process, Thawney alleges, he was questioned by a DOC official about whether he had a gang affiliation. Thawney disclosed that he previously identified as a Crips gang member and was "not a Blood." SAC ¶ 7. At that time, Thawney was 43 years old and no longer considered himself a member of the Crips gang. However, he understood that his prior affiliation with the gang put him in danger of assault from younger members of a rival gang like the Bloods. *Id.* ¶ 28.

On April 12, 2016, Thawney was returning to the MDC from a court appearance when correction officers informed him that he would be moved to a new housing unit. Thawney alleges that the transfer was authorized by Captain Summers. *Id.* This new housing unit, Thawney asserts, housed many members of the rival Blood gang. *Id.* ¶ 29. Thawney also alleges that the correction officer who authorized and executed his transfer knew that Thawney was identified as a Crip "with a low security risk classification," *id.* ¶ 30, and knew that this new housing unit would be dangerous for inmates such as Thawney who were not members of the Blood gang, *id.* ¶ 35.

Thawney was escorted by several officers, identified here as the John Doe defendants, to his new housing unit. *Id.* ¶ 31. Thawney objected to the move. He explained that because he

---

[1] The facts related herein are drawn from the Second Amended Complaint ("SAC") and attached exhibits. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). The Court accepts all factual allegations in the SAC as true and draws all reasonable inferences in plaintiffs' favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2

was not a Blood gang member, he would be in danger in the new unit. The John Doe officers responded that Thawney should take up his complaint with the officers working the next shift. *Id.* ¶ 32.

When Thawney arrived at the housing unit, the officers ordered him into a cell. While he was walking to his designated cell, several inmates asked if he was "banging"—an apparent reference to gang membership. *Id.* ¶ 31. Thawney ignored the question. *Id.* Before he could arrive in his cell, a number of inmates surrounded and attacked him with "sharp razor like objects" that, according to Thawney, could only have been smuggled into the jail. *Id.* ¶¶ 32–33. Thawney alleges that, as the other inmates attacked him, Officer Garcia and the John Doe correction officers stood by and did nothing to break up the assault. *Id.* ¶ 34.

Thawney was then taken to the medical clinic. *Id.* ¶ 35. His medical records note that he suffered lacerations that were caused by "a sharp razor like object." *Id.* ¶ 36. Thawney asserts that he suffered, among other injuries, multiple cuts to the back of his head, his left eyelid, and his face under his left eye.

Thawney brings six claims: (1) a § 1983 claim against Captain Summers and the John Doe defendants for moving Thawney to a housing unit where they knew he would be endangered, *id.* ¶¶ 40–43; (2) a § 1983 claim against Officer Garcia and the John Doe correction officers for failing to intervene as inmates attacked Thawney, *id.* ¶¶ 44–46; (3) a claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), alleging that the City and DOC Commissioner Ponte (i) refused to implement procedures that would reduce the smuggling of contraband into DOC facilities and (ii) failed to enforce existing procedures intended to prevent smuggling, *id.* ¶¶ 48–51; (4) a state law negligence claim against Captain Summers and the John Doe defendants for moving Thawney to the housing unit, *id.* ¶¶ 52–56; (5) a state law negligence

3

claim against Officer Garcia and the John Doe defendants for failing to prevent or stop the assault, *id.* ¶¶ 57–61; and (6) a state law tort action against the City under a respondeat superior theory of liability, *id.* ¶¶ 62–64.

**B.      Allegations Regarding the Smuggling of Contraband into DOC Facilities**

As background to his *Monell* claim, Thawney provides information about the smuggling of contraband and weapons into DOC facilities.

Thawney attaches as an exhibit to his Second Amended Complaint ("SAC") a New York City Department of Investigation ("DOI") Report from November 2014 that addresses the smuggling of contraband into DOC prisons. The report "uncovered several key vulnerabilities for DOC facility security" and criticized "lax basic procedures." *See* SAC, Ex. A ("DOI 2014 Report") at 6. The report identifies two causes of the failure to prevent widespread smuggling of contraband: First, existing protocols were insufficient to detect and prevent illegal conduct. *Id.* at 1. Second, personnel did not consistently follow even those insufficient protocols. *Id.* As a result, the DOI report concludes, "weapons and narcotics remain easily available to any inmate with funds to pay for them." *Id.* Thawney also attaches a 2018 DOI report identifying vulnerabilities and security failures at municipal detention centers in Manhattan and Brooklyn. The 2018 report concludes: "[T]hree years after our 2014 undercover contraband operation, many of the same vulnerabilities remain at DOC and essential recommendations DOI made in 2014 have not been fully implemented." SAC, Ex. C ("DOI 2018 Report") at 1–2. Thawney asserts that these vulnerabilities made it possible for inmates to obtain sharpened weapons, and he alleges that his assailants used such weapons during the April 12, 2016 attack.

In addition to the 2014 and 2018 DOI reports, the SAC references the Mayor's Management Report from fiscal year 2017. That report notes that, despite decreasing crime

4

levels and inmate populations, the number of inmate stabbings has increased. SAC ¶¶ 13, 18, 26. Additionally, the SAC references news articles. *Id.* ¶ 14.

C.  **Procedural History**

On March 15, 2017, Thawney commenced this action. Dkt. 1. On June 23, 2017, defendants answered. Dkt. 12. On January 23, 2018, Thawney filed his First Amended Complaint. Dkt. 32. On March 22, 2018, defendants moved to dismiss the First Amended Complaint. Dkt. 45. On April 12, 2018, Thawney filed the operative SAC. Dkt. 49. On May 10, 2018, defendants moved to dismiss that complaint. Dkt. 51. On June 5, 2018, Thawney filed a memorandum of law in opposition to defendants' motion. Dkt. 53. On June 21, 2018, defendants filed a reply memorandum of law in support of their motion to dismiss. Dkt. 54.

II.  **Applicable Legal Standards**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's [*f*]*actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570 (internal quotation marks omitted) (emphasis in *Arista Records*). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

## III. Discussion

Defendants move to dismiss Thawney's SAC on five grounds—that: (1) the SAC fails to state a cause of action against Captain Summers and Officer Garcia; (2) Captain Summers and Officer Garcia are entitled to qualified immunity; (3) the SAC fails to state a viable *Monell* claim; (4) the SAC fails to allege that Commissioner Ponte is involved in any constitutional violations; and (5) the Court should decline to exercise supplemental jurisdiction over Thawney's state-law claims. The Court addresses each argument in turn.

### A. Claims Against Captain Summers and Officer Garcia

The Eighth Amendment imposes on prison officials an obligation to "take reasonable measures to guarantee the safety of the inmates," which includes a duty "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (internal quotations omitted). Thus, prison officials are liable for harm incurred by an inmate if the officials act with "deliberate indifference" to an inmate's safety. *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). To state a claim that prison officials acted with deliberate indifference, an inmate must plausibly allege "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to

6

mitigate the risk that the condition posed to the . . . detainee even though the defendant-official knew, or should have known, that the conditions posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

Defendants argue that the SAC does not set forth sufficient facts from which one could draw the inference that Captain Summers or Officer Garcia acted with deliberate indifference. That argument is unpersuasive. In the first place, the SAC has plausibly pled that a substantial threat to his safety existed. It alleges that Thawney previously identified as a Crip, and was transferred to a housing unit dominated by rival gang members. As courts in this Circuit have repeatedly recognized, gang-affiliated inmates may face a substantial risk of harm when they are housed in areas controlled by rival gangs. *See Greene v. Garcia*, No. 12 Civ. 4022 (LAP)(MHD), 2013 WL 1455029, at *6 (S.D.N.Y. Mar. 26, 2013) (denying motion to dismiss § 1983 claim where inmate alleged that prison officials placed him into rival gang's housing area); *Plunkett v. City of New York*, No. 10 Civ. 6778 (CM), 2011 WL 4000985, at *4 (S.D.N.Y. Sept. 2, 2011) (holding that trier of fact could conclude that housing one gang member in rival gang's unit poses a substantial risk of serious harm to inmate); *Walker v. Shaw*, No. 08 Civ. 10043 (CM), 2010 WL 2541711, at *8 (S.D.N.Y. June 23, 2010) (noting that plaintiff could state a deliberate indifference claim "if he alleged that identified, responsible prison officials failed to promptly relocate him from the Crips cell block after he was classified as a Blood"). The risk to gang-affiliated inmates housed with members of a rival gang is especially serious with respect to Crips and Bloods, whose violent rivalry is "long-standing and well-documented." *Walker*, 2010 WL 2541711, at *4.

Defendants next argue that Thawney has failed to plead that either Captain Summers or Officer Garcia knew of, and disregarded, the substantial risk presented by Thawney's housing

transfer. The Court disagrees. With respect to Captain Summers, the SAC alleges both that Thawney identified as a former Crip, and that this information was contained on his floor card. SAC ¶ 27. Notwithstanding this designation, Captain Summers allegedly ordered his transfer to a unit that had "a high concentration of . . . Blood and . . . Trinitarian" gang members. SAC, Ex. E ("DOC Memorandum"). The very purpose of documenting gang affiliations such as Thawney's is to ensure that "members of rival gangs can be separated in order to minimize the risk of disruption and injury to inmates and staff alike." *Plunkett*, 2011 WL 4000985, at *4. Indeed, "prison [officials are] well aware of the substantial risk of attack to inmates who are affiliated with one gang and housed with members of a rival gang." *Walker v. City of New York*, No. 08 Civ. 10043 (KBF), 2012 WL 345890, at *4 (S.D.N.Y. Feb. 2, 2012). Based on Thawney's allegations, a trier of fact could conclude that Captain Summers knew, or should have known, that Thawney had been designated as a Crip on his floor card yet consciously ignored the risk to his safety by authorizing his transfer to a unit that housed "a high concentration" of rival gang members. This is sufficient to state a viable claim of deliberate indifference. *See Walker*, 2010 WL 2541711, at *8–11.

As to Officer Garcia, Thawney alleges that Garcia stood by as Thawney was attacked and stabbed by other inmates. It is well established that an officer acts with deliberate indifference if he is aware of an attack, has an opportunity to protect the inmate, and does not intervene. *See, e.g., Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) ("In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." (internal quotations omitted)); *Taylor v. City of New York*, No. 16 Civ. 7857 (NRB), 2018 WL 1737626, at *12 (S.D.N.Y. Mar, 27, 2018) ("Likewise,

plaintiff here has stated a claim for deliberate indifference to safety against [defendant], who witnessed the attack on plaintiff and allegedly failed to take action to prevent it."). While the facts remain to be discovered, the Court concludes that the SAC has adequately pled claims against Officer Garcia.

Finally, defendants argue that Thawney's claims fall because he does not specifically allege that he was attacked by Bloods; he identifies his assailants only as other "inmates." SAC ¶ 32. This argument ignores Thawney's allegation that the assault occurred almost immediately after Thawney was "asked if he was 'banging'"—a reference to gang membership—and Thawney ignored the question. *Id.* ¶ 31. Indeed, after the assault, another non-defendant officer wrote that Thawney, "an assessed [Security Risk Group] Crip, was assaulted by several . . . Trinitarian and . . . Blood members." DOC Memorandum. While discovery may shed more light on the affiliations of Thawney's assailants, the SAC's allegations are sufficient to give rise to a plausible inference that Thawney was attacked because he was a Blood rival.

### B. Qualified Immunity

Defendants next argue that even if Thawney stated a claim against Captain Summers and Officer Garcia, they are entitled to qualified immunity. Under the familiar qualified immunity standard, a government employee acting in his or her official capacity "is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotations omitted). "As long as reasonably competent officials could disagree about whether the conduct at issue would violate clearly established rights, the immunity defense is available." *Plunkett*, 2010 WL 4000985, at *6 (citing

9

*Malley v. Briggs*, 475 U.S. 335, 341 (1986)). On a motion to dismiss, a qualified immunity defense will prevail "if the complaint fails to allege the violation of a clearly established constitutional right." *Williams v. Fisher*, No. 02 Civ. 4558 (LMM), 2003 WL 2217010, at *11 (S.D.N.Y. Sept. 18, 2003).

Here, Thawney has plausibly alleged a violation of his clearly established constitutional rights. As discussed above, Thawney alleges that Captain Summers and Officer Garcia acted with deliberate indifference to the serious risk that Thawney would be injured by rival gang members with whom he was to be housed. This alleged conduct violates the clearly established rule that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. And the Second Circuit has so held in a similar context to the one presented here: that an incarcerated plaintiff may bring a § 1983 deliberate indifference action based on allegations that prison officials housed "gang members [and] non-gang members" in the same housing unit and so allowed "gang activities, violence . . . [and] fights" to flourish. *Walker v. Schult*, 717 F.3d 119, 122, 126 (2d Cir. 2013) (holding that plaintiff "plausibly alleged violations of clearly established rights" when he asserted that prison officials were deliberately indifferent to the risk of housing non-gang members with gang members). As another court in this district has explained, "any reasonable corrections officer would know that placing Bloods and Crips together creates a recipe for violence." *Plunkett*, 2011 WL 4000985, at *7. Thus, "no reasonable corrections officer could possibly have thought that he was doing anything other than placing a Crip . . . in danger" by housing a Crip in a unit dominated by Bloods. *Id.*

Because the SAC has pled the violation of a clearly established constitutional right, the Court must reject, at this stage of the litigation, defendants' qualified immunity argument. While

10

discovery may yield evidence showing that defendants' conduct was "objectively reasonable" in the circumstances, the Court cannot now reach that conclusion as a matter of law. *See Salahuddin v. Goord*, 467 F.3d 263, 275–76 (2d Cir. 2006).

### C. *Monell* Claim

To state a § 1983 claim against a municipality, the plaintiff must allege that an officially adopted policy or custom caused his injury. *See Monell*, 436 U.S. at 694; *see also Bd. of Cnty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997) (plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights"). A plaintiff may satisfy the "policy or custom" requirement by alleging

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

The SAC's *Monell* allegations appear principally to implicate the third method.[2] Under that method, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 404; *see also Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (noting

---

[2] The SAC also implicates the fourth method by which a plaintiff may satisfy *Monell*'s policy requirement. It alleges, in passing, that the City "fail[ed] to train, supervise, or discipline" its prison officials. SAC ¶ 51. However, the SAC does not develop that failure to train allegation or substantiate it in any way. Such conclusory and boilerplate language, without more, is insufficient to state a *Monell* claim. *See Plair v. City of New York*, 789 F. Supp. 459, 469 (S.D.N.Y. 2011) (collecting cases).

11

that a municipality's custom "need not be memorialized in a specific rule or regulation"). Thus, a plaintiff may establish municipal liability by demonstrating that a policy maker "indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." *Miller v. Cty. of Nassau*, 467 F. Supp. 2d 308, 314 (E.D.N.Y. 2006). To prevail on this theory of municipal liability, however, a plaintiff must prove that the custom at issue is permanent and well-settled. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (noting that Supreme Court "has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law" (internal quotations omitted)).

Municipal inaction may constitute a policy or custom under *Monell* "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). A municipal failure to act will constitute official policy or custom "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Id*. Such inadequate policies "must reflect a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction." *Id*. at 193. In addition, the plaintiff must "show a causal relationship" between the municipalities' failures and "the alleged deprivations to plaintiffs." *Id*.

Thawney's *Monell* claim can be summarized as follows: The DOC has a policy of ignoring the smuggling of weapons into prisons, and its refusal to implement or enforce effective policies constitutes deliberate indifference. To substantiate these allegations, he points to two

12

DOI reports from 2014 and 2018, as well as the Mayor's Management Report from fiscal year 2017, that criticize existing DOC policies regarding the detection of contraband. In particular, the DOI reports indicate that DOC has not implemented adequate procedures to stem the flow of weapons and other contraband into prisons. *See generally* DOI 2014 Report; DOI 2018 Report.

Thawney, however, has not alleged, as he must, that the City's policies regarding the prevention of smuggling of contraband constitute a deliberate choice rather than mere negligence. He cites DOI reports concluding that "the smuggling of weapons and narcotics" into jails is a "significant problem," DOI 2014 Report at 1, and these reports document numerous instances of non-compliance with DOC anti-smuggling policies. But the DOI reports, on which Thawney relies to demonstrate the City's inadequate enforcement, also document the City's efforts to combat illegal smuggling and formulate more effective procedures to prevent the flow of weapons and drugs to prisoners. For instance, the 2014 DOI Report notes that city officials have conducted undercover investigations intended to test the efficacy of existing security policies. *Id.* at 6. The City's investigation led to the arrest of a number of correctional officers who were accused of smuggling. *Id.* The 2018 DOI Report documents similar investigations, which took place in 2017. 2018 DOI Report at 3–6.

Efforts to crack down on the smuggling of weapons into prisons, as reflected in the reports generated by city officials at DOI, reflect an attempt to preserve prisoners' constitutional rights. Although DOI concludes that the City's efforts have not yet been sufficient to fully remedy the problem, its lack of efficacy does not render the City's conduct unconstitutional. To the contrary, where a municipality takes steps "to protect plaintiffs' rights, it cannot, at the same time, be deemed deliberately indifferent to those rights." *Reynolds*, 506 F.3d at 197; *see also id.* ("State defendants took affirmative steps to investigate and correct the City's misconduct,

13

including specific directions to the city agency to correct incidents of non-compliance. We cannot conclude the state defendants have tacitly authorized . . . the violations that [they have] vocally and actively opposed."). At most, Thawney's allegations give rise to a plausible inference of "negligence or bureaucratic inaction." *Id.* at 193. But that is not enough to provide a basis for liability under *Monell*. Accordingly, Thawney's *Monell* claim against the City and Commissioner Ponte must be dismissed.

### D. Claims Against Commissioner Ponte

Defendants also argue that Thawney has failed to allege that Commissioner Ponte was personally involved in any constitutional violation. Thus, they contend, to the extent that Thawney asserts any claims against Ponte, those claims must be dismissed. In the SAC, Commissioner Ponte is mentioned as a defendant only with respect to the alleged *Monell* violations. SAC ¶ 49. As the Court has dismissed Thawney's *Monell* claim, it has dismissed the sole claim made against Commissioner Ponte. Accordingly, it need not consider this argument.

### E. State Law Claims

Thawney has also asserted three state law claims. He alleges (1) negligence by Captain Summers and the John Doe defendants for transferring him into a high risk housing unit, SAC ¶¶ 52–56; (2) negligence against Officer Garcia and the John Doe defendants for failing to prevent and stop the attack on Thawney, *id.* ¶¶ 57–61; and (3) a claim against the City under a respondeat superior theory of liability, *id.* ¶¶ 62–64. Defendants argue that if the Court dismisses all the federal claims, it should decline to exercise jurisdiction over the remaining state law claims. They do not argue that the state law claims should be dismissed on any other basis. Because the Court has denied defendants' motion to dismiss two of the three federal claims, it

denies their request that the Court decline to exercise supplemental jurisdiction over the related state law claims.

## CONCLUSION

For the reasons stated above, the Court denies defendants' motion to dismiss Thawney's first, second, fourth, fifth, and sixth causes of action; and grants defendants' motion to dismiss claim three, which alleges municipal liability under *Monell*. The Clerk of Court is respectfully directed to remove Commissioner Ponte from the caption of this case and to terminate the motions pending at docket numbers 45 and 51. Within one week of this decision, the parties are directed to submit a revised case management plan to govern discovery, consistent with the Court's individual rules.

SO ORDERED.

                                              PAUL A. ENGELMAYER
                                              United States District Judge

Dated: October 11, 2018
       New York, New York